IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DEANNA JEAN CHESLEY

                Plaintiff,

    v.

CAROLYN W. COLVIN,
Acting Commissioner of
Social Security

                Defendant.

No. 3:14-CV-00893-HZ

OPINION & ORDER

Laurie B. Mapes
PO Box 1242
Scappoose, OR 97056

      Attorney for Plaintiff

Ronald K. Silver
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR 97201

1 - OPINION & ORDER

Thomas M. Elsberry
Social Security Administration
SSA Office of General Counsel
701 5th Avenue, Suite 2900 M/S 901
Seattle, WA 98104

       Attorneys for Defendant


HERNÁNDEZ, District Judge:

       Plaintiff Deanna Jean Chesley brings this action under the Social Security Act ("Act"), 42 U.S.C. §§ 405(g) and 1383(c), for judicial review of the Commissioner of Social Security's final decision denying her claim for Supplemental Security Income ("SSI") under Title XVI of the Act and for Disability Insurance Benefits ("DIB") under Title II of the Act. Because the Administrative Law Judge ("ALJ") improperly rejected Chesley's testimony about the severity and limiting effects of her many symptoms, and failed to give legally sufficient reasons for rejecting multiple opinions from her long-time primary care physician, the Commissioner's decision is reversed and this case is remanded for an immediate award of benefits.

## PROCEDURAL HISTORY

       Chesley applied for SSI and DIB on June 3, 2009. Tr. 217–33. The Commissioner denied both claims. Tr. 142–49. She reapplied for both SSI and DIB in May of 2010, with a protective filing date of May 11, 2010. Tr. 11, 234–43. The Commissioner denied the claims initially and after reconsideration. Tr. 150–58, 164–68. After a hearing in June of 2012, ALJ Wayne Araki found Ms. Chesley was not disabled. Tr. 8–31. Ms. Chesley appealed that decision, and submitted to the Appeals Council additional evidence that was unavailable to the ALJ. Tr. 317–25, 906–23. The Appeals Council denied her request for review, explaining that it "considered the reasons [Ms. Chesley] disagreed with the [ALJ's] decision and the additional evidence," but

concluded there was no basis for changing the ALJ's decision. Tr. 1–2. Chesley timely appealed

the ALJ's decision to this Court.

## BACKGROUND

Chesley was born with hip dysplasia, and was diagnosed at age three months with

neurofibromatosis, a progressive genetic disorder that worsens with age and can cause internal

and external tumors, learning disabilities, cosmetic disfigurement, headaches, and cardiovascular

complications. Borders v. Colvin, No. 2:13-CV-01985-AA, 2014 WL 6901177, at *1 (D. Or.

Dec. 3, 2014) (citing *NINDS Neurofibromatosis Fact Sheet,* National Institutes of Health,

http://www.ninds. nih.gov/disorders/neurofibromatosis/detail—neuro fibromatosis.htm). She

began having seizures at seventeen, and developed migraines in her early twenties. Tr. 331, 341.

Despite these serious impairments, Chesley completed two years of college and worked

regularly from 1987 to 2008; her annual earnings between 199 through 2007 typically exceeded

$20,000. Tr. 251, 265. She worked as a deli clerk at a grocery store from 1996 to 2002. Tr. 265.

She then trained to be a nurse assistant, a job she held for about eighteen months between

October 2006 and April 2008. Tr. 40–41, 293. But she was eventually fired for making too many

mistakes. Tr. 42–43. About six months later, she got a job as a CNA in a care facility, but was

fired after two months because, she was told, she did not "mesh well" with others and she

worked too slowly. Tr. 40.

Around the same time, Chesley's health had started to deteriorate. She began regularly

visiting her primary care physician at the Salem Clinic, Dr. Gordon Gillespie, primarily

complaining of migraines, seizures, and respiratory problems. Tr. 395. Another doctor at the

Salem Clinic, Dr. Andy Carp, who treated Chesley when Dr. Gillespie was unavailable, noted

that a cardiologist diagnosed a "left mediastinal mass." Tr. 392. In 2009, she reported sharp chest

pains, excessive daytime sleepiness, and feeling depressed. Tr. 390. In 2010, Dr. Carp referred Chesley to a surgeon about the mass in her chest, which had grown and was causing more discomfort. Tr. 443. The surgeon diagnosed the growth as a likely "enlarging neurofibroma," and that, because of its location near her carotid artery, the risks of surgery included laryngeal nerve injury and vocal cord paralysis. Tr. 444. Chesley underwent surgery to remove the mass in August of 2010, and, after she immediately had trouble speaking, was diagnosed with left vocal cord paralysis. Tr. 459, 603–05. She had another surgery to implant an artificial graft in her vocal cord. Tr. 629. After the implant surgery her voice improved, but remains "breathy" and difficult to understand. Tr. 48–49, 585. The implant also prevents her from swallowing normally, which can lead to choking and even vomiting, up to several times a day. Tr. 47–49, 681–88. Dr. Gillespie referred her to swallow therapy, and was evaluated as "safe for a mechanical soft diet, with extra moisture and . . . chin tuck with all swallows." Tr. 681, 683.

Chesley also has a neurofibroma tumor behind her left eye that is inoperable because of a high risk of damaging her optic nerve or causing brain damage. Tr. 57–58. Dr. Gillespie believes a large tumor on her foot is a significant factor in her hip, knee, and inner groin pain. Tr. 873.

The frequency and severity of her migraines has varied, though she testified at the hearing in front of the ALJ in June, 2012, that she rarely has a day free from some kind of headache. Tr. 57, 391, 395. One migraine in 2010 was so bad she went to the emergency room. Tr. 434. In 2011, the headaches seemed to wane until September, when she reported headaches that she could not relieve with Vicodin. Tr. 807. Chesley reported to Dr. Gillespie in February of 2012, that her headaches had been "rather constant over [the] past few months," and were getting progressively worse. Tr. 834. She has tried a variety of treatments, including over-the-counter medication, ice, and prescription pain medication, but nothing offers any lasting relief. Tr. 48–

51. She received Botox injections in 2001 that helped significantly, but she has not received any since because her insurance refused to cover it. Tr. 341.

Her seizures are nocturnal, meaning their frequency is difficult to track. Tr. 472. The medication she takes causes significant daytime sleepiness and concentration problems. Tr. 905. And even with medication, she still experiences at least one to three reportable seizures per year, and each one leaves her very fatigued and confused. Tr. 275, 281, 301, 340, 472.

She has numerous other health problems and related issues that the Court will discuss as necessary to explain the decision to remand for an award of benefits.

## SEQUENTIAL DISABILITY EVALUATION

A claimant is disabled if she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability claims are evaluated according to a five-step procedure. See Valentine v. Comm'r Soc. Sec. Admin., 574 F.3d 685, 689 (9th Cir. 2009). Each step is potentially dispositive. At step one, the presiding ALJ determines whether the claimant is engaged in "substantial gainful activity." If so, the claimant is not disabled; if not, the analysis continues. 20 C.F.R. §§ 404.1520(b), 416.920(b). At step two, the ALJ determines whether the claimant has one or more severe impairments. If not, the claimant is not disabled. 20 C.F.R. §§ 404.1520(c), 416.920(c). At step three, the ALJ determines whether the impairment meets or equals one of the impairments listed in the SSA regulations and deemed "so severe as to preclude substantial gainful activity." Bowen v. Yuckert, 482 U.S. 137, 141 (1987); 20 C.F.R. §§ 404.1520(d), 416.920(d). If so, the claimant is conclusively presumed disabled; if not, the analysis moves to step four. 20 C.F.R. §§ 404.1520(d), 416.920(d). At step four, the ALJ determines whether the

claimant, despite any impairments, has the residual functional capacity ("RFC") to perform past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant cannot perform his or her past relevant work, the analysis moves to step five where the ALJ determines whether the claimant is able to do any other work in the national economy considering the claimants RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(g), 416.920(g).

The burden to show disability rests with the claimant at steps one through four, but if the analysis reaches step five, the burden shifts to the Commissioner to show that a significant number of jobs exist in the national economy that the claimant could perform. 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f); Tackett v. Apfel, 180 F.3d 1094, 1098–1100 (9th Cir. 1999). If the Commissioner demonstrates a significant number of jobs exist in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g)(1), 416.920(g).

## THE ALJ'S DECISION

At step one, the ALJ found Chesley had not engaged in substantial gainful activity since December 26, 2008, her alleged onset date. Tr. 13. At step two, the ALJ found she had the "following severe impairments: nervous system disorder, arthropathies in the hips, back, and knees, migraine headaches, sleep apnea, depression, cognitive/learning disorder, attention deficit hyperactivity disorder (ADHD), and bladder issues[.]" Tr. 13. At step three, the ALJ found her impairments did not meet or equal the requirements of a listed impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. 15. Next, the ALJ assessed Chesley's RFC:

> [C]laimant has the residual functional capacity to perform light work as defined in 20 CFR 404.7567(b) and 416.967(b) except the claimant can stand or walk for 2 hour intervals, 8 hours per day, and can sit for 2 hour intervals, 8 hours per day. The claimant can frequently stoop, crouch, kneel, balance, use stairs, and crawl. The claimant cannot climb ladders, ropes, or scaffolding. The claimant is able to remember, understand, and carry ou[t] simply instructions or tasks generally

required by occupations with a specific vocational preparation (SVP) of 1-2. The claimant is also able to deal with routine workplace stressors, to make routine workplace decisions, and to make adjustments to routine workplace changes required or characteristic of occupations with an SVP or 1-2. The claimant can occasionally to frequently user her voice as required by job tasks.

Tr. 17–18. At step four, the ALJ found that Chesley could perform her past relevant work as a donor processor. Tr. 23. Accordingly, the ALJ found the Chesley was not disabled. Tr. 25.

## STANDARD OF REVIEW

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986). If the evidence is susceptible to more than one reasonable interpretation, the court must uphold the decision. Andrews, 53 F.3d at 1039–40. A reviewing court must consider the entire record as a whole and cannot affirm the Commissioner by simply isolating a specific quantum of supporting evidence. Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006) (citation omitted).

## DISCUSSION

Chesley contends the ALJ erred by 1) improperly discounting the credibility of her testimony about the severity and limiting effects of her many symptoms, and 2) failing to offer legally sufficient reasons for rejecting two opinions from her long-time primary care physician.[1] Each is addressed in turn.

---

[1] Chesley asserts additional grounds for reversal in her Opening Brief, but the Court does reach them.

### 1. Chesley's Credibility

In formulating Chesley's RFC, the ALJ discounted her testimony about the intensity, persistence, and limiting effects of her symptoms as "not completely credible." Tr. 18. The ALJ erred, however, because he did not give clear and convincing reasons to support his adverse credibility determination.

In determining a claimant's RFC, the ALJ must consider all relevant evidence in the record, including medical records, lay testimony, and the "effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." Robbins, 466 F.3d at 883 (quoting SSR 96–8p, 1996 WL 374184, at *5); see also 20 C.F.R. §§ 404.1529(a), 404.1545(a), 416.929(a), 416.945(a) (explaining that, in determining whether a claimant is disabled, the Social Security Administration considers "all . . . symptoms, including pain, and the extent to which [those] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.")

An ALJ analyzes the credibility of a claimant's testimony regarding her subjective pain and other symptoms in two steps. Lingenfelter v. Astrue, 504 F.3d 1028, 1035–36 (9th Cir. 2007). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." Id. at 1036 (citation and internal quotation omitted). "The claimant, however, need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." Id. (citation and internal quotation omitted). If the claimant meets the first test, and there is no evidence of malingering, the ALJ can reject her testimony about the

severity of her symptoms only by offering specific, clear and convincing reasons for doing so. Id. (citation and internal quotation omitted).

At step one, the ALJ found that Chesley's medically determinable impairments could reasonably be expected to cause some of her alleged symptoms. Tr. 18. She alleged that her neurofibromatosis caused tumors, seizures, migraines, memory loss, anxiety, voice and vision problems, and a learning disability, all which limit her ability to work. Tr. 18. At the hearing, Chesley testified about her migraines and other headaches, which she believed were caused by a tumor growing behind her right eye. She stated that she sometimes had to lie down for four to five hours a day, and sometimes all day, to deal with headaches and other pain. Tr. 58. She also alleged sleep apnea, incontinence, and "problems with her voice after she had a mediastinal tumor removed." Tr. 58.

The ALJ in this case did not find that Chesley was malingering. In fact, her long-time primary care physician specifically opined that he did not believe she was malingering. Tr. 667. The ALJ found at step two, however, that Chesley's statements about the intensity, persistence, and limiting effect of her symptoms was "not completely credible." Tr. 18. He discounted her testimony because her activities of daily living, use of over-the-counter medication, failure to follow prescribed treatment, and the medical evidence in the record were inconsistent with the degree of limitation she claimed. Tr. 18–23. None of those reasons stand up to scrutiny.

### a.  Activities of Daily Living

The ALJ discredited Chesley's testimony regarding her persistent migraine and other headaches because, the ALJ said, her daily activities and use of over-the-counter medication contradicted her testimony about her symptoms' debilitating effects. Tr. 19. Engaging in daily activities that are inconsistent with the severity of symptoms can support an adverse credibility

finding. Winn v. Colvin, No. 6:14-CV-00564-HZ, 2015 WL 1809012, at *5 (D. Or. Apr. 21, 2015) (citing Ghanim v. Colvin, 763 F.3d 1154, 1165 (9th Cir. 2014)). The ALJ explained that Chesley's "alleged functional abilities during her migraine headaches, including working and driving, as well as her use of over-the-counter medication instead of prescribed migraine medication, is inconsistent with the levels of pain reported." Tr. 19. He also remarked that Chesley's ability to "live independently . . . do her own housework, and care for her son" suggested that she was not as limited as she claimed. Tr. 21.

But Chesley testified that she uses ice or over-the-counter treatments in an attempt to "be the mom I'm supposed to be" and drive her son to karate class. Tr. 49. If she takes the prescription medication, she is unable to drive safely, and one of her parents, with whom Chesley and her son live, must drive him. Tr. 314. Without the medication, she cannot complete even the most basic activities such as preparing a meal, making her bed, or walking the dog. Tr. 314. Chesley's dilemma, in other words, is to either suffer through the pain of her headaches with only ice as treatment so she can care for her son, or take her prescription pain killer and force her parents to step in to take her son to karate. Chesley's father explained that this conundrum leads to arguments and stress among the family. Tr. 314. And other than visiting the doctor, performing simple house chores, and watching TV, this drive with her son to karate class appears to be the only activity Chesley still conducts with any regularity. See Tr. 313–16. Chesley's decision to eschew prescription medication in favor of engaging with and caring for her son in this particular way is not a clear and convincing reason to discount her credibility. See Orn v. Astrue, 495 F.3d 625, 639 (9th Cir. 2007) ("This court has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities does not in any way detract from her credibility as to her overall disability.") (citation and quotation marks omitted); Fair v. Bowen,

885 F.2d 597, 603 (9th Cir. 1989) (explaining that a person "does not need to be utterly

incapacitated" to be considered disabled) (citation and quotation marks omitted).

The ALJ also repeatedly stated that Chesley's ability to live independently, do her own

housework, care for her son and a dog suggests she is not as limited as she claims. But those

conclusions are belied by the record. Chesley has lived with her parents, while raising her own

child, since at least 2006. Tr. 226. Both parents testified that her attempts to do "even the

simplest tasks," such as putting clothes in the dryer, causes her severe pain and requires rest for

at least thirty minutes. Tr. 314–15.  Her mother wrote that Chesley "tr[ies] to be a mom of a pre-

teen," but because of her disabilities, both her and Chesley's father "help out with her son daily,"

including "making some decisions for him, as well as Deanna." Tr. 315. It is true that Chesley

wrote that she performs some very basic life activities such as feeding and letting a dog out to go

to the bathroom, or doing her son's laundry, but on that same form, Chesley wrote that her

mother helps her with those activities when Chesley cannot perform them. Tr. 286. The ALJ's

selective reading of the record is not a clear and convincing reason for discounting Chesley's

credibility. See Gallant v. Heckler, 753 F.2d 1450, 1456 (explaining that the ALJ cannot "reach a

conclusion first, and then attempt to justify it by ignoring competent evidence in the record that

suggests the opposite result."). Moreover, those simple activities bear no "meaningful

relationship to activities in the workplace," and are therefore insufficient to support a negative

credibility determination. Orn, 495 F.3d at 639 (citing Burch v. Com'r, 400 F.3d 676, 681 (9th.

Cir. 2005)).

### b.  Inconsistencies with Medical Evidence

The ALJ also discounted Chesley's credibility because the limitations she testified to

were inconsistent with medical evidence in the record. Tr. 18–20. First, the ALJ found her

testimony about her seizure disorder incredible because her symptoms were "controlled with medication." Tr. 18. But the ALJ failed to account for the debilitating side effects of the medication required to treat her seizures. Dr. Gillespie, Chesley's long-time primary care physician, opined that she had serious "issues with concentration" including an inability to focus for "more than a few minutes" without becoming distracted. Tr. 905. These problems were primarily driven by the "medications that are utilized to control her seizure disorder." Tr. 905. Dr. Gillespie tried to reduce the medication to mitigate the side effects, but "unfortunately her conditions exacerabate[d]" and she had to resume the treatment. Tr. 905. Dr. Gillespie offered a similar opinion in a 2011 letter. Tr. 667–68. Dr. Thye Schuyler, a sleep disorder specialist whom Chesley visited in 2012, explained that despite "good compliance" with CPAP treatment for sleep apnea, Chesley still suffered from significant daytime sleepiness. Dr. Schuyler opined it was "very likely . . . due to her medication use. She is on phenobarbital and Klonopin, both medication with long half[-]lives that can lead to daytime sleepiness." Tr. 712. The medical evidence is consistent with Chesley's explanation of the seizure medication's side effects, which she explained included "sleepiness, clums[iness], forgetfulness, cognition, repeating myself," Tr. 282. Her parents both stated she suffers from fatigue from her medication, bouts of confusion, and a limited ability to concentrate. Tr. 274, 314–316.

The ALJ's failure to address the side effects of Chesley's medications and the impact those effects had on her ability to work was legal error. Anderson v. Astrue, No. 6:11-CV-06377-SI, 2013 WL 55919, at *9 (D. Or. Jan. 3, 2013) (citing Varney v. Sec'y Health & Human Servs., 846 F.2d 581, 585 (9th Cir. 1988) ("[i]f the Secretary chooses to disregard a claimant's testimony as to the subjective limitations of side effects, he must support that decision.").

Furthermore, the ALJ did not address reports from several medical sources that, because her seizures happen while she is sleeping, it is difficult to determine when and how many seizures Chesley actually experiences. Tr. 335–36, 523. Again, the ALJ cannot pick and choose only those portions of the record that support his conclusion. See Gallant, 753 F.2d at 1456.

Next, the ALJ stated that the medical evidence about Chesley's neurofibromatosis was "inconsistent with the degree of severity alleged." Tr. 18. The ALJ explained that Chesley had "some symptoms" related to the disease, but pointed to two physical exams, one performed by Dr. Michael Winn, and the other by Dr. Kurt Brewster, in which her symptoms seemed to be "largely unremarkable." Id. at 18–19. The ALJ relied on a note from Dr. Michael Winn that, during one of those visit, he "explained to [Chesley] that many of the problems she is having are unrelated to the neurofibromatosis." Tr. 19; Tr. 756.

Nothing in Dr. Winn's statement suggests that Chesley is dishonest about the extent of her limitations; that she may not understand the true medical cause of her numerous symptoms is not a clear and convincing reason for discrediting her testimony. Moreover, the ALJ's reasoning disregards ample evidence in the record that Chesley's neurofibromatosis has caused, and will certainly continue to cause, serious health problems. Dr. Carp, one of Chesley's treating physicians, opined that her disorder "has no cure and certainly may progress" beyond the problems it had already caused her, namely "memory impairment, forgetfulness, cognitive impairment" and a chest tumor that required risky surgery to remove. Tr. 444, 474. That surgery paralyzed one of her vocal chords requiring further surgery to insert a prosthetic implant so she could speak, and physical therapy so she could re-learn to swallow. Tr. 675, 681, 683. She also has an inoperable tumor behind her left eye, a painful tumor on her foot that makes walking difficult, and other tumors on her "back, legs and essentially throughout her entire body." Tr. 57–

58, Tr. 426. Dr. Gillespie wrote it was "only a matter of time before another neurofibroma develops, requiring surgical intervention." Tr. 905. While the genetic disorder may not in fact cause all of Chesley's many health problems, her belief that neurofibromatosis is a fundamental factor in her impairments is not a clear and convincing reason for discounting her testimony.

### c.   Pain Testimony & Over-The-Counter Medication

The ALJ also discredited Chesley's testimony because the pain she reported in her knees, back, and hips was not supported by medical evidence and she successfully treated the pain with over-the-counter medication. Tr. 19. "While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects." Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir.2001). The treatment and medication a claimant uses to relieve pain is relevant in assessing credibility, and an ALJ may consider reliance on over-the-counter medication in evaluating a claimant's allegations about the severity of his or her impairment. Meyen v. Colvin, No. 3:13-CV-00936-JE, 2015 WL 1883894, at *7 (D. Or. Apr. 23, 2015) (citing Burch v. Com'r, 400 F.3d at 681; Parra v. Astrue, 481 F.3d 742, 750–51 (9th Cir. 2007); Johnson v. Shalala, 60 F.3d 1428, 1434 (9th Cir. 1995).

The ALJ pointed to some medical evidence that showed only "mild signs of degenerative change." Tr. 19. But the ALJ did not even mention x-rays that showed hip dysplasia and growing neurofibromatosis tumors, Tr. 890, 894–95, or that a "[l]arge neurofibroma" on her right foot was "likely a sig[nificant] contributing factor to her hip, knee, and inner groin pain." Tr. 873. And it is true that Chesley reported some relief with over-the-counter remedies on occasion. See Tr. 785–86 (Aleve provided "improvement" with back pain); Tr. 835 (heat and chiropractic treatment helped neck and back pain). But many more times, she complained of ongoing pain

with only minimal or temporary relief from such treatment. <u>See</u> Tr. 622 (noting Chesley experienced pelvic pain for months, despite taking Vicodin); Tr. 811 ("pain control is poor even with naproxen" and Vicodin); Tr. 819 (chronic neck pain helped "only minimally" with anti-inflammatory medication); Tr. 824 (constant hip pain helped "temporarily" with heat treatment, but Vicodin, anti-inflammatory medication not helping). Dr. Gillespie prescribed different anti-inflammatory medications, but noted they were "unlikely" to have any meaningful impact, as "previous medication such as nabumetone and naproxen" failed to offer any significant and sustained relief. Tr. 873. He referred her to an orthopedic specialist to assess whether she should undergo surgery to remove the growth on her right foot. Tr. 873. Subsequently, Chesley went to physical therapy to try and alleviate some of her pain. Tr. 903.

This is not a case like <u>Burch</u>, where the ALJ properly discounted the claimant's pain allegations because he went months without seeking treatment for his condition. 400 F.3d at 681. Here, Chesley reported chronic back, hip, and groin pain for more than a year, and visited her doctors on an almost-monthly basis. She tried a variety of different treatments ranging from heat packs, ice, over-the-counter medicine, many different prescriptions including anti-inflammatories and narcotics, physical therapy, and even explored surgery. The ALJ's conclusions that she only had "mild" symptoms that were generally controlled with over-the-counter medication is a very selective reading of the record, and is therefore, not a clear and convincing reason for discounting Chesley's testimony regarding her pain and limitations. <u>Edlund v. Massanari</u>, 253 F.3d 1152, 1159 (9th Cir. 2001), <u>as amended on reh'g</u> (Aug. 9, 2001) (explaining that "selective focus" on portions of the record supporting ALJ's conclusion is not a clear and convincing reasons for rejecting or discounting evidence.

It is true that Chesley admitted to treating her migraines with extra strength Tylenol while working, but she also said it was effective only to "get some of the edge of it off so I could at least go through work until I got home," and even to that extent, she said it only worked "[s]ometimes, not always," and it was "usually not" effective. Tr. 51–52. Additionally, she stopped working in 2008, four years before the hearing, and she testified that her migraine have increased in both intensity and severity since then, sometimes lasting as long as eight hours or even overnight. Tr. 13, 49, 59. Again, the ALJ's reasoning falls short of the clear and convincing standard required to affirm his findings regarding Chesley's credibility.

The ALJ also questioned the severity of her sleep apnea symptoms because she was not using her CPAP machine as much as her doctors recommended. Tr. 19–20. But again, that conclusion is based on a very selective reading of the record. After using the CPAP for at least six months, Dr. Schuyler reported in January of 2012 that Chesley had been in "good compliance" with the CPAP machine but was still experiencing "excessive daytime sleepiness." Tr. 712. He opined that it was likely due to a number of factors in addition to sleep apnea, including "medication induced sleepiness and potentially nocturnal epilepsy further fragmenting sleep. Tr. 712. Moreover, the doctor's note the ALJ cites in support of his criticism of Chesley's "suboptimal use" of her CPAP machine for "less than four hours each night" states that Chesley was "congratulated of CPAP adherence," and that she was "dismayed" that she appeared to be removing the machine in her sleep for "unknown reasons." Tr. 794. Once again, the ALJ's selective reading of the medical record is not a clear and convincing reason for discounting Chesley's testimony. Edlund v. Massanari, 253 F.3d 1152, 1159 (9th Cir. 2001), as amended on reh'g (Aug. 9, 2001).

### 2. Dr. Gillespie's Opinion

Next, Chesley contends that the ALJ erred by improperly giving "no weight" to two opinion letters from Dr. Gillespie, her long-time primary care physician. There are three sources of medical opinion evidence in Social Security cases: treating physicians, examining physicians, and non-examining physicians. Valentine, 574 F.3d at 692 (citing Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995)). The ALJ can reject the uncontroverted opinion of a treating or examining physician only for "clear and convincing reasons" supported with substantial evidence in the record. Orn, 495 F.3d at 632 (quoting Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998)). Even if a treating or examining doctor's opinion is contradicted by another doctor, the ALJ can reject it only by providing "specific and legitimate reasons" that are supported by substantial evidence. Id.

Dr. Gillespie's first letter, dated December 20, 2011, stated that he believed Chesley would miss one to two days of work per week "because of her headaches, concentration issues, and other medical problems." Tr. 667. Her "primary diagnoses" were "neurofibromatosis, chronic neck pain from arthritis, attention deficit disorder, depression with significant anxiety, lacunar infarct . . . and seizure disorder. All of these diagnoses were made through either clinical evidence or imaging studies." Tr. 667. She also suffered from "headaches, intermittent confusion, excessive somnolence, and lack of attention to detail." Tr. 668. "Unfortunately," Dr. Gillespie wrote, "the symptoms are persistent and constant with frequent daily exacerbations." Tr. 668. Moreover, Dr. Gillespie explained that he "attempted to detail some of her symptoms [at] each clinic visit, although the broad spectrum of her symptoms makes it difficult to detail each symptom at each visit." Tr. 668.

His second letter, dated July 9, 2012, expanded on his initial opinion. "I have been the primary care provider for Deanna for over a decade," he wrote. Tr. 905. "She has multiple medical problems that significantly impair her ability to perform her activities of daily living." Tr. 905. He explained that "due to her neurofibromatosis, she has issues with endurance and pain. She becomes dyspneic after only a few minutes of activity. This has worsened as a result of her recent surgical removal of a thoracic neurofibroma." Tr. 905. Her concentration issues were primarily caused by "medications that are utilized to control her seizures disorder. She has minimal ability to concentrate for more than a few minutes that then becomes distracted. We have attempted to reduce her medications but unfortunately her conditions exacerbate . . . ." Tr. 905.  In his opinion, Chesley is "not fit for employment of any kind, now or in the future." Tr. 905.

The ALJ rejected Dr. Gillespie's opinions as "quite conclusory," with "very little explanation of the evidence relied on in forming his opinion," based primarily on her subjective complaints, lacking in support from cognitive testing, and more limiting that the objective evidence supports.  Tr. 22.

But Dr. Gillespie's letters cannot be fairly described as "conclusory." The letters were tailored to specifically address Chesley's symptoms and limitations, and his opinions are based on a treatment relationship approximately a decade long. Tr. 667–68; 905. They are a far cry from the conclusory "check box" surveys that are common in SSI cases, and which an ALJ can permissibly reject if not accompanied by a sufficient explanation. See Holohan v. Massanari, 246 F.3d 1195, 1207 (9th Cir. 2001). Dr. Gillespie's letters explained Chesley's diagnoses, the medications she is taking, her mental state, and how those things work in combination to significantly limit her ability to work. Tr. 905.

18 - OPINION & ORDER

Dr. Gillespie may not have performed his own cognitive testing, but his opinions are consistent with the opinion of Dr. David Freed, a psychologist who examined Chesley in June of 2010. Tr. 418. Dr. Freed performed an array of cognitive tests and identified "learning disabilities," "impairments in attention and concentration," "significant symptoms of depression and ADHD," and "mild cognitive impairments" that Dr. Freed said may be related to the combination of her neurofibromatosis, seizures, ADHD, and the effects of her seizure medication. Tr. 421–23. Dr. Freed even recommended that Chesley "consider applying for Social Security benefits given her diagnosis of Neurofibromatosis and a seizure disorder . . . ." Tr. 424. The ALJ made only a generic reference to "objective findings that demonstrate some cognitive learning limitations," but did not explain his reasons for discounting or rejecting Dr. Freed's opinion. Tr. 20.

To the extent the ALJ discounted Dr. Gillespie's opinions because he relied on Chesley's subjective complaints, that is not a legally sufficient basis because, as discussed above, the ALJ's negative credibility finding was erroneous. And the Court also notes that Dr. Gillespie's opinions are entirely consistent with the opinion of Dr. Carp, another treating physician, who stated that "[d]ue to neurofibromatosis [with] memory impairment, forgetfulness, cognitive impairment, and recent chest mass requiring thoracic surgery, I feel [Chesley] is disabled." Tr. 474.

Finally, Dr. Gillespie offered further explanation of his opinions to the Appeals Council when it was reviewing Chesley's claim. Tr. 918–23. When the Commissioner's final decision includes an Appeals Council ruling denying review, any additional evidence that body considered becomes part of record upon which the final decision is based. Brewes v. Com'r of Soc. Sec. Admin, 682, F3d 1157, 1162 (9th. Cir. 2012). Accordingly, the Court can, and indeed must consider that new evidence when reviewing the Commissioner's final decision for

substantial evidence. Id. at 1163. In this supplementary letter, Dr. Gillespie explains in detail

each of Chesley's numerous major disorders, the methods he used to diagnose them, and the

ways they impact her life. For example, he explains that, based on "imaging, pathology and

physical exam," it was "without refute" that Chesley has neurofibromatosis, and that "[a]s

recently as 2009 she has required [surgery] of a neurofibroma that was endangering her life due

to proximity to her carotid artery." Tr. 918. He used imaging and physical examination to

diagnose a "congenital hip deformity" and other degenerative conditions in her spine and knees.

Tr. 918–19. He explained that she suffers from migraines which require the use of "narcotic

analgesics a minimum of 3-4 times a month." Tr. 919. Like all migraine patients, "[o]bjective

confirmation of this diagnosis remains elusive," though he noted that imaging showed a "lacunar

infarction as a manifestation of chronic migraines." Tr. 919. He also noted Chesley's headaches

are especially difficult to treat because of "medication interactions and other factors." Tr. 919.

He wrote about her sleep apnea, depression, ADHD, and bladder issues in similar detail,

explaining how many of these problems overlap with her seizure and pain medication. Tr. 919

    In one particularly illuminating section, Dr. Gillespie explains what the ALJ

characterized as a paucity of findings regarding Chesley's many symptoms in his office visit

notes:

> To list all of Deanna's symptoms would be nearly impossible. She has [illegible]
> positive review of symptoms, meaning that most everything we would ask a
> patient would to some degree or another be positive. For instance,
> musculoskeletal review of systems, in which she has neck pain, shoulder pain,
> arm pain, back pain, leg pain, foot pain, joint swelling, joint popping, stiffness,
> [illegible] muscle cramps. For the remaining problems in a review of systems,
> the entire officer visit would be [spent on] her review of symptoms.

Tr. 919.

He further wrote that "Deanna has several issues that individually would impair her ability to work foremost of which is her migraines. Despite efforts to [treat] her migraines, she still has 1-2 migraines per week, far above the goal of 2 or fewer per month." Tr. 920. "This problem," Dr. Gillespie stated, "cannot be documented by objective data but is based on reporting by the patient." Tr. 920. Because of her seizure disorder, Dr. Gillespie's treatment options are limited to narcotics. He also explained her history of seizures also made it difficult to treat her ADHD or hypersomnolence because it precludes any stimulants. Tr. 920.

Finally, Dr. Gillespie wrote again that he did not believe Chesley is malingering:

> Deanna has informed me in the past that she is frustrated by her limitations. She would like to care for her son and to help her family in any way possible. However, with her medical problems, she requires multiple pharmacologic agents that could potentially impair her concentration. This would include her antiepileptics in addition to her narcotic analgesics. Basically, the more active she is, the more pain she has, resulting in greater requirements for more pain medications. This then impairs her ability to function fully, creating a vicious cycle.

Tr. 921. Unfortunately, portions of the next section of his written submission are illegible, but Dr. Gillespie's opinion is clear:

> [illegible] confirm she is not malingering. I have discussed her issues with her parents and [illegible] confirm my thoughts that Deanna is not malingering. Even with [illegible] depression, she remains motivated to improve herself, but because of her limitations [illegible] any abilities that would be required of her to maintain meaningful employment.

Tr. 921.

The ALJ gave Dr. Gillespie's opinions "no weight." Tr. 22. Instead, ALJ gave "significant weight" to the opinions of Drs. Kurt Brewster and D. Steve Truong, each of whom examined Chesley one time. Tr. 20–21. Dr. Brewster met with Chesley for a mere twenty-nine minutes in August 2009. Tr. 335. He also reviewed four 2004 medical reports, which are not in

21 - OPINION & ORDER

the record before the Court, and three random chart notes from the Salem Clinic. Tr. 335–40. Dr. Brewster opined that her seizure disorder was "controlled" by medication. Tr. 346. He also found Chesley's reported difficulties with migraine headaches were not supported by any findings during his examination, and were contradicted by her ability to perform about two hours of house work. Tr. 341–42. He concluded that Chesley could walk or stand for six hours in an eight-hour work day and was not limited in any significant way, other than "occasional restrictions on light and sound due to migraine headaches." Tr. 347–48. But Dr. Brewster also recognized the shortcomings in his evaluation: "RFC reflects findings from exam and available medical record," he wrote. Tr. 347. "Adjustment of RFC reasonable if documentation is submitted showing greater degree of pathology than on exam or within available medical records." Tr. 347.

Similarly, Dr. Truong examined Chesley on July 20, 2010, and found that her neurofibromatosis and seizure disorders were essentially "stable" Tr. 20–21. He opined that she could stand and walk with regular breaks for a total of four hours in an eight hour work day, carry 20 pounds occasionally and 10 pounds frequently, and that she was not significantly limited in her ability to push, pull, sit, operate hand or foot controls, grab or reach in any direction, or in gross or fine manipulation. Tr. 21; 429. Dr. Truong based his opinion on a physical exam and a review of some "chart notes from her primary care physician . . . [and] some chart notes by Dr. David Freed . . . ." that Chesley brought with her to the appointment. Tr. 426.

The reliance on the opinions of Drs. Brewster and Truong is flawed for a number of reasons. Both doctors relied on an extraordinarily small slice of Chesley's extensive medical records. Dr. Brewster even admitted that his analysis might change if presented with additional medical records evidencing Chesley's symptoms. See Tr. 347. Both reports were more than two years old at the time of the ALJ's decision, meaning the ALJ essentially disregarded substantial

medical records created in the interim that describe how Chesley's symptoms, especially her migraines, had worsened. And both visits occurred before Chesley underwent a risky surgery to remove a life-threatening nuerofibroma tumor growing near her carotid artery. That surgery, as discussed above, significantly changed Chesley's life—her subsequently paralyzed vocal cord required a prosthetic implant, which hampered her ability to talk and swallow foods. Dr. Gillespie also explained that Chesley suffers from "issues with endurance and pain" because of the symptoms of her neurofibromatosis. Tr. 905.

Finally, the ALJ credited Dr. Truong's and Dr. Brewster's opinions as consistent with Chesley's reported daily activities, including "caring for her son, a dog, driving," and her "ability to live independently, [and] do her own housework." But as explained above, the ALJ mischaracterized her capabilities and disregarded testimony from Chesley and three lay witnesses about her significant difficulty performing even these simple tasks. See Tr. 54–55, 313–16

The ALJ's rather summary analysis and rejection of Dr. Gillespie's opinions is contrary to well-established Ninth Circuit law that the medical opinions and conclusions of "treating physicians are entitled to special weight." Embrey v. Bowen, 849 F.2d 418, 421 (9th Cir. 1988). Treating doctors are "employed to cure" and have a "greater opportunity to know and observe the patient as an individual." Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989) (quoting Sprague v. Bowen, 812 F.2d 1226, 1230 (9th Cir. 1987)); see also Teran v. Colvin, No. CV 13-193-TUC-CRP, 2014 WL 4904770, at *3 (D. Ariz. Sept. 30, 2014) (explaining that "treating physicians are in a unique position to know claimants as individuals, and because the continuity of their dealings with claimants enhances their ability to assess the claimants' problems.") (citations omitted). The apparent conflict between the letters from Chesley's long-term treating

physician and the poorly supported opinions from Drs. Brewster and Truong is not a legitimate reason for discrediting Dr. Gillespie's opinions.

### 3. Remand

Having established that the ALJ committed legal error in discounting Chesley's testimony and in rejecting Dr. Gillespie's opinions, the final question is whether to remand for additional proceedings or an award of benefits. See, e.g., Garrison v. Colvin, 759 F.3d 995, 1019 (9th Cir. 2014) (explaining that if "additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded," but "in appropriate circumstances courts are free to reverse and remand a determination by the Commissioner with instructions to calculate and award benefits") (internal quotation marks omitted).

The Ninth Circuit applies a three-part test to determine which type of remand is appropriate. Id. at 1020. First, the ALJ must fail to provide legally sufficient reasons for rejecting evidence. Second, the record must be fully developed and further administrative proceedings would serve no useful purpose. Third, if the case is remanded and the improperly discredited evidence is credited as true, the ALJ would be required to find the claimant disabled. Each part must be satisfied to remand an award for benefits. Id.

Here, the ALJ failed to provide legally sufficient reasons for rejecting Chesley's testimony and Dr. Gillespie's limitations. Dr. Gillespie's properly credited opinion is that Chesley's symptoms would cause her to miss work at least one or two days per week, and the VE testified that a person with such sporadic attendance could not sustain competitive employment. Tr. 67–69. Chesley's properly credited testimony is that pain and fatigue cause her to lie down on average at least four to five hours in an eight hour day, and the VE testified that a person who required even one extra one-hour rest break could not hold a job. Tr. 67. Therefore,

the record is fully developed, and if the case were remanded and the improperly rejected or

discounted evidence is credited as true, the ALJ would be required to find Chesley disabled

under the Act.

## CONCLUSION

The Commissioner's decision is REVERSED and REMANDED for a determination of

benefits.

IT IS SO ORDERED.

Dated this ___3___ day of ___June___, 2015.

MARCO A. HERNÁNDEZ
United States District Judge